# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OSS NOKALVA, INC.<br><br>                Plaintiff,<br><br>    v.<br><br>EUROPEAN SPACE AGENCY<br><br>               Defendants. | Civil Action No.<br>08-CV-3169(MLC)(TJB) |

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT EUROPEAN SPACE AGENCY'S MOTION TO DISMISS

---

**WOLFF & SAMSON PC**
Ronald L. Israel
One Boland Drive
West Orange, New Jersey 07052
(973) 530-2045
Attorney for Plaintiff
OSS Nokalva, Inc.

1177800.3

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ...................................................................... 3

    1.    Introduction/Background ...................................................... 3

    2.    OSSN Enters into Four Software License and
        Corresponding Maintenance Agreements with ESA over
        a Period of Eight Years ........................................................ 3

    3.    ESA Knowingly Negotiated, and Agreed to Each and
        Every  Term in, the Licensing Agreements Including
        Forum Selection/Jurisdiction Clauses That Provide For
        Resolution of All Disputes in New Jersey ........................... 8

    4.    ESA Was Aware that its Distributions Violated the
        License Agreements ............................................................ 9

ARGUMENT ...................................................................................... 13

    I.    STANDARD ...................................................................... 13

    II.    U.S. LAW, NOT THE ESA CHARTER, GOVERNS THE
        SCOPE OF IMMUNITY AND DICTATES WHEN AND
        HOW AN INTERNATIONAL ORGANIZATION MAY
        WAIVE IMMUNITY ......................................................... 13

    III.    ESA WAIVED WHATEVER IMMUNITY IT MAY HAVE
        HAD WHEN IT NEGOTIATED AND ENTERED INTO
        EIGHT  WRITTEN CONTRACTS WITH OSSN, EACH OF
        WHICH  PROVIDE FOR JURISDICTION AND VENUE IN
        NEW  JERSEY FOR THE RESOLUTION OF ALL
        DISPUTES. ........................................................................ 17

    IV.    ESA'S CHARTER WAIVED WHATEVER IMMUNITY ESA
        MAY HAVE HAD. .............................................................. 24

    V.    PUBLIC POLICY CONCERNS SUPPORT OSSN ........................ 32

    VI.    ESA DOES NOT HAVE IMMUNITY FROM SUIT IN THIS
        CASE. ................................................................................ 32

A.    There is No Absolute Immunity Under the IOIA as of 1976. ........................................................................ 33

B.    ESA has no Immunity in this Case Based upon FSIA's  Commercial Activity Exception ...................... 37

CONCLUSION ..................................................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Home Mortgage Corp. v. First Am. Title Ins. Co., No. 07-01257(JLL),
2007 WL 3349320 (D.N.J. Nov. 9, 2007) ..............................................................19

Atkinson v. Inter-American Development Bank, 156 F.3d 1335 (D.C. Cir.
1998) ..................................................................................... 26, 28, 29, 30, 33-37

Banco de Seguros del Estado v. Int'l Fin. Corp., Nos. 06-Civ. 2427, 06-Civ.
3739, 2007 WL 2746808 (S.D.N.Y. 2007)............................................................20

Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705 (D.N.J. 2001)...................18

Bro Tech Corp. v. European Bank for Reconstruction and Development, No.
CIV.A. 00-02160, 2000 WL 1751094
(E.D. Pa. Nov. 29, 2000)........................................................ 15, 18-20, 26, 27, 29

Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190
(3d Cir. 1980)..............................................................................................17, 21, 32

Crescent International, Inc. v. Avatar Communities, Inc., 857 F.2d 943
(3d Cir. 1988)..........................................................................................................21, 32

In re Dinastia, L.P., 381 B.R. 512 (S.D. Tex. 2007)...............................................19

Gerlach v. Snee, No. 06-0881, 2007 WL. 1488773 (D.N.J. May 18, 2007)...........18

International Business Software Solutions, Inc. v. Sail Labs. Tech., AG, 440
F. Supp. 2d 357 (D.N.J. 2006) .................................................................................17

Intel Corp. v. Commonwealth Scientific & Industrial Research Organization,
455 F.3d 1364 (Fed. Cir. 2006)................................................................................38

John Wyeth & Brother Ltd. v. CIGNA International Corp., 119 F.3d 1070
(3d Cir. 1997)...........................................................................................................30

In re Kaiser Group International Inc., 399 F.3d 558 (3d Cir. 2005)........................15

Inversora Murten, S.A. v. Energoprojekt-Niskogradnja Co. Ltd., 264 Fed. App'x 13, 14 (D.C. Cir. 2008).....................................................................30

Mendaro v. World Bank, 717 F.2d 610 (D.C. Cir. 1983)......... 20, 25, 26, 28, 29, 30

Osseiran v. International Finance Corp., 498 F. Supp. 2d 139 (D.D.C. 2007), aff'd 552 F.3d 836 (D.C. Cir. 2009).................................................................13, 27

Osseiran v. International Finance Corp., 552 F.3d 836 (D.C. Cir. 2009)…………………………………………………………15,16,17,23,27

Peterson v. Islamic Republic of Iran, 563 F. Supp. 2d 268 (D.D.C. 2008)............30

Republic of Argentina v. Weltover Inc., 504 U.S. 607 ...........................................38

Re-Source America, Inc. v. Corning Inc., No. 06-3485, 2007 WL 174714 (D.N.J. Jan. 19, 2007) .................................................................................21, 22, 32

Vangura Kitchen Tops, Inc. v. C & C N. America, Inc., No. 08-CV-1011, 2008 WL 4540186 (W.D. Pa. Oct. 7, 2008) .......................................................21, 32

Vila v. Inter-America Investment Corp., 536 F. Supp. 2d 41 (D.D.C. 2008)..............................................................................15, 28, 31

# STATE CASES

Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334 (1979)..........23

Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442 (1966) ...................23

Thermo Contracting Corp. v. Bank of N.J., 69 N.J. 352 (1976) .............................24

# STATUTES

15 U.S.C. §§ 78dd-ff ..............................................................................................34

22 U.S.C. § 288a(b) ..........................................................................................14, 33

28 U.S.C. § 1601 ....................................................................................................37

28 U.S.C. § 1602 ....................................................................................35

28 U.S.C. § 1605(a)(2) ...........................................................................37

28 U.S.C. § 1605(a)(3) ...........................................................................38

## OTHER

Exec. Order No. 11,966, 42 C.F.R. 4331 (1977) .....................................35

Exec. Order No. 12,238, 1980-43 I.R.B. 22 (1980) ................................35

H.R. Rep. No. 105-802, 105th Cong., 2d Sess. 1998, 1998 WL 710062 ..........34, 35

Kevin M. Whiteley, Holding International Organizations Accountable
Under the Foreign Sovereign Immunities Act: Civil Actions Against the
United States for Non-Commercial Torts, 7 Wash. U. Global Stud. L. Rev.
619 (2008) ...............................................................................................36

Letter from Robert B. Owen, State Department Legal Adviser, to Leroy D.
Clark, General Counsel, Equal Employment Opportunity Commission (June
24, 1980), reprinted in 74 Am. J. Int'l L. 917 (1980) .......................14, 36

Restatement (Second) of Agency § 82 (1957) .......................................24

Steven Herz, International Organizations in U.S. Courts: Reconsidering the
Anachronism of Absolute Immunity, 31 Suffolk Transnat'l L. Rev. 471
(2008) ...............................................................................................32, 36

## **PRELIMINARY STATEMENT**

The question before the Court is whether a European international organization can negotiate and ultimately enter into eight separate contracts with a New Jersey company, each specifically providing for New Jersey jurisdiction and venue for any dispute arising out of the contract, willfully breach each of those contracts by unlawfully distributing that company's proprietary software and then claim that it is immune from suit for its unlawful conduct.  The simple answer is no, it cannot.  Defendant European Space Agency ("ESA") knowingly waived any immunity it may have had and did so intentionally to induce Plaintiff OSS Nokalva, Inc. ("OSSN") to enter into each of the eight contracts, to license to ESA OSSN's proprietary software, and to provide maintenance with respect to such software.  (See Point III below).  ESA's waiver of immunity is supported by the express language of the International Organizations Immunity Act ("IOIA") (language that ESA failed to disclose to this Court) and case law discussing the IOIA.

Even if ESA had not waived immunity by consenting to New Jersey jurisdiction and venue and by providing for resolution of disputes in each of its contracts with OSSN, ESA still waived immunity in this case because under well-settled law, where an international organization has a contractual relationship with an outside third party (i.e. not an employee of the organization), the international

organization is deemed to have waived immunity under a "corresponding benefits" analysis.  (See Point IV below).  Finally, ESA's entering into contracts for the licensing of software is commercial activity that itself is not subject to an immunity defense.  (See Point VI below).

Between 1996 and 2004, OSSN entered into four software license agreements and four software maintenance agreements (collectively, the "License Agreements") with ESA relating to the licensing of OSSN's core revenue-generating software product.  These License Agreements contain restrictive provisions governing how and to what extent ESA can use OSSN's proprietary software.  ESA knowingly and willfully violated the License Agreements by admittedly distributing OSSN's proprietary software to numerous third parties. ESA's unauthorized and illegal distribution of OSSN's software was nothing less than an outright piracy of OSSN's creation, allowing the third-party recipients of those distributions to benefit from the use of OSSN's proprietary software without having to pay the appropriate licensing fees to OSSN.

OSSN was forced to commence this lawsuit in order to protect its interests as set forth in the License Agreements.  Since ESA has no meritorious defense to OSSN's claims, and has in fact admitted to the misconduct alleged by OSSN, it now attempts to further shirk its obligations by concocting a frivolous immunity argument, despite the fact that it expressly waived immunity in each of the License

Agreements.  For these reasons and those expressed below, ESA's motion to dismiss should be denied.

## STATEMENT OF FACTS

### 1.    Introduction/Background

OSSN is a leading vendor of software development toolkits ("Proprietary Software") that enable its clients worldwide, both private companies and public entities, to develop their own complete software applications.  (Declaration of Grace Sigona, "Sigona Dec.", ¶ 2).  OSSN's Proprietary Software allows computer programs that are written in different programming languages and running on different computer operating systems to communicate with each other.  (Sigona Dec., ¶ 3).  As set forth in more detail below, OSSN entered into four software license and corresponding maintenance agreements (the "License Agreements") with ESA pursuant to which ESA licensed OSSN's Proprietary Software.  Id.

### 2.    OSSN Enters into Four Software License and Corresponding Maintenance Agreements with ESA over a Period of Eight Years

On July 2, 1996, ESA entered into a software license agreement with OSSN for a licensing fee of $25,000, whereby ESA licensed the right to utilize OSSN's ASN.1 Compiler for Solaris Development (the "Compiler"), and OSSN's BER Encoder/Decoder and PER Encoder/Decoder runtime libraries in conjunction with a SUN SPARC Target Platform.  (Sigona Dec., ¶ 4, Exs. A, B ("5941 License Agreement")).  The Compiler component of OSSN's Proprietary Software is used

to generate certain source code that is also part of OSSN's Proprietary Software. Id.  Pursuant to the 5941 License Agreement, ESA was permitted to use OSSN's Proprietary Software solely for ESA's internal business purposes.  (Sigona Dec., ¶ 5).  That agreement also prohibited ESA from assigning, sublicensing or otherwise transferring OSSN's Proprietary Software without OSSN's prior written consent and from disclosing OSSN's Proprietary Software to any person other than ESA's employees.  Id.

ESA and OSSN also entered into a software maintenance agreement in conjunction with the 5941 License Agreement.  (Sigona Dec., ¶ 6, Ex. B).  Under that maintenance agreement, for an annual fee, OSSN agreed to provide maintenance services for OSSN's Proprietary Software licensed under the 5941 License Agreement, as well as subsequent releases, revisions and modifications to that software.  (Sigona Dec., ¶ 7).  In the maintenance agreement, ESA reaffirmed that it was subject to the licensing provisions set forh in the 5941 License Agreement. Id.

On March 29, 2000, ESA entered into another software license agreement (and corresponding maintenance agreement) with OSSN whereby ESA, for $6,250, licensed the right to utilize OSSN's BER Encoder/Decoder, PER Encoder/Decoder, and DER Encoder/Decoder runtime libraries in conjunction with an Open VMS DEC Alpha Target Platform.  (Sigona Dec., ¶ 8, 9, Exs. C, D ("7936

License Agreement")). The 7936 License Agreement only permitted ESA to utilize these components of OSSN's Proprietary Software for ESA's internal business purposes on this particular platform. The 7936 License Agreement also prohibited ESA from distributing OSSN's Proprietary Software to third parties unless OSSN's Proprietary Software was integrated into a complete application developed by ESA.

On July 20, 2000, ESA again entered into a software licensing agreement (and corresponding maintenance agreement) with OSSN whereby ESA, for $3,375, licensed the right to utilize OSSN's BER Encoder/Decoder, PER Encoder/Decoder, and DER Encoder/Decoder runtime libraries in conjunction with a Windows NT x86 Target platform. (Sigona Dec., ¶ 10,11, Exs. E, F ("8117 Licensing Agreement")). The 8117 License Agreement only permitted ESA to utilize these components of OSSN's Proprietary Software for ESA's internal business purposes on this particular platform. The 8117 License Agreement also prohibited ESA from distributing OSSN's Proprietary Software to third parties unless OSSN's Proprietary Software was integrated into a complete application developed by ESA.

On February 9, 2004, ESA and OSSN entered into another license agreement (and corresponding maintenance agreement) whereby, for $6,250, ESA licensed the right to utilize OSSN's BER Encoder/Decoder, PER

Encoder/Decoder, and DER Encoder/Decoder libraries in conjunction with a SUSE Linux x86 Target platform.   (Sigona Dec., ¶ 12,13, Exs. G, H ("9661 License Agreement")).   Once again, ESA agreed to use the aforementioned components of OSSN's Proprietary Software only for its internal business purposes and on this particular platform.   The 9661 License Agreement also prohibited ESA from distributing OSSN's Proprietary Software to third parties unless OSSN's Proprietary Software was integrated into a complete application developed by ESA.

The Proprietary Software that OSSN designs and develops for its customers, and which it licensed to ESA pursuant to the License Agreements, allows OSSN's customers to utilize OSSN's Proprietary Software to develop their own customized complete applications.   (Sigona Dec., ¶ 14).   In that regard, the License Agreements prohibit ESA from disclosing, and require ESA to maintain, the confidentiality of OSSN's ideas, know-how, algorithms and other proprietary information within OSSN's Proprietary Software provided to ESA by OSSN and within any code generated using OSSN's Proprietary Software ("Confidential Information").   (Sigona Dec., Exs. A, C, E & G).   In fact, by executing the 7936 License Agreement, 8117 License Agreement and 9661 License Agreement, ESA expressly acknowledged the following:

> . . . [ESA] will not use Confidential Information (except as an incident of ordinary use of Program(s));

. . . [ESA] will not disclose Confidential Information, and will maintain its confidentiality . . .

. . . [ESA] shall not remove any copyright, confidentiality, or other proprietary notice provided by OSS in connection with Confidential Information and any copies thereof which [ESA] may make.  [ESA] shall ensure that, in distributing [a complete] application, it does not disclose the application program interface (API) to the OSS runtime libraries.  [ESA] shall not . . . de-compile, disassemble or otherwise reverse-engineer the [Proprietary Software] or any portion thereof, and shall include a similar prohibition in all permitted external distributions.

[Sigona Dec., Exs. C, E & G].

Similarly, in the 5941 License Agreement, ESA agreed that it will i) maintain the confidentiality of OSSN's Confidential Information; ii) take all reasonable steps to safeguard the Confidential Information from access by unauthorized persons and iii) include all copyright proprietary rights notice provided by OSSN on any authorized copy it makes of the Confidential Information.  (Sigona Dec., Ex. A).

Furthermore, OSSN generally indicates the proprietary and confidential nature of its software by indicating on its software that: "THIS FILE IS PROPRIETARY MATERIAL OF OPEN SYSTEMS SOLUTIONS, INC.[1] AND MAY BE USED ONLY BY DIRECT LICENSEES OF OPEN SYSTEMS

---

[1] Open Systems Solutions, Inc. subsequently changed its name to OSS Nokalva, Inc.

SOLUTIONS, INC.  THIS FILE MAY NOT BE DISTRIBUTED." (Sigona Dec.,

¶ 17).

> **3.     ESA Knowingly Negotiated, and Agreed to Each and Every Term in, the Licensing Agreements Including Forum Selection/Jurisdiction Clauses That Provide For Resolution of All Disputes in New Jersey**

ESA negotiated, and ultimately agreed to each and every term in, the

License Agreements.  For example, from January 22 through February 8, 2004, the

days leading up to the execution of the 9661 License Agreement, ESA exchanged

several emails with OSSN in which it requested and obtained certain changes to

the 9661 License Agreement prior to its execution.  (Sigona Dec., ¶ 15, Ex. I).

Among the provisions to which ESA specifically agreed in this and the other

License Agreements were forum selection/jurisdiction clauses that provide that any

disputes arising out of the License Agreements would take place in New Jersey.

(Sigona Dec., Exs. A, C, E & G).

In the 9661 License Agreement, which is the most recent of the License

Agreements, as well as the 7936 License Agreement and the 8117 License

Agreement, ESA agreed that:

> This Agreement shall be governed by the laws of the state of New Jersey and [ESA] **expressly submits to jurisdiction therein** by process served by mail on [ESA] at its above address and agrees that **any dispute arising out of this Agreement shall be subject exclusively to**

> **the jurisdiction of New Jersey courts or the Federal court for the district of New Jersey.**
>
> [ESA] agrees to pay reasonable expenses, including legal fees, incurred by OSS to enforce its rights hereunder and/or to collect any amount due it from [ESA].

(Sigona Dec., Exs. C, E, G (emphasis added)).

Furthermore, each of the four License Agreements, along with their accompanying maintenance agreements, was executed by a different representative of ESA. (Sigona Dec., Exs. A–H). The 5941 License Agreement was executed by S.J. Wicks, the Head of ESA's Space Operations Center (ESOC) Contracts; the 7936 License Agreement by P. Maigne, ESA's Technical Officer; the 8117 License Agreement by Michael Jones, the Head of ESA's Infrastructure Section and the 9661 License Agreement by Gilbert Drechsel, the Head of ESA's Purchase Offices. Id. Given the number of individuals who negotiated the terms of and executed the License Agreements on ESA's behalf, and the fact that at least three of them were heads of their respective departments, it is clear that ESA authorizes several individuals to enter into commercial contracts on its behalf.

### 4.    ESA Was Aware that its Distributions Violated the License Agreements

Not only did ESA violate each of the License Agreements by distributing OSSN's proprietary material, it did so willfully and with the knowledge that its actions were prohibited under those agreements. On March 19, 2004, approximately one month after the parties entered into the 9661 License

Agreement, ESA's representative Francesco Affaitati asked OSSN whether and

how ESA could redistribute OSSN's Proprietary Software and was advised in

writing that each intended recipient would have to obtain a license from OSSN.

The e-mail from Mr. Affaitati stated:

> Sir,
>
> [with regard to] the License agreement No. 5941 we have
> between OSS and ESA/ESOC, I would like to have some
> clarifications… I see from the License condition that it is
> written "Neither the Program(s) nor this Agreement may
> be assigned, sublicensed or otherwise transferred by
> Customer without prior consent from OSS…. So …
>
> ii) can we distribute to third parties our application in
> source form together with the code generated by the OSS
> compiler and the libasn1code binary, without asking the
> third party to open a license agreement with OSS?
>
> I would appreciate if you may clarify to me this aspect of
> the license agreement.

(Sigona Dec., ¶ 16, Ex. J).

OSSN responded, "**No, this would require that your third party opens a**

**license agreement with OSS, or that you pay royalties on behalf of your**

**customers.**" Id. (emphasis added).

Notwithstanding OSSN's direction, ESA nonetheless distributed to third

parties certain components of OSSN's Proprietary Software in a form that was

expressly prohibited under the License Agreements – that is, not integrated into a

complete application developed by ESA.

For example in April, 2006, Terma GmbH ("Terma") notified OSSN that Terma had received OSSN's Proprietary Software from ESA.   (Sigona Dec., ¶ 17). Terma's representative, Giovanni Scotti, inquired whether the OSSN Proprietary Software it received from ESA is "still valid" or whether OSSN could provide the appropriate files that would allow Terma to build the library it required.  Id.  In fact, Mr. Scotti attached an OSSN file to his email that contained the following text: "THIS FILE IS PROPRIETARY MATERIAL OF OPEN SYSTEMS SOLUTIONS, INC. AND MAY BE USED ONLY BY DIRECT LICENSEES OF OPEN SYSTEMS SOLUTIONS, INC.   THIS FILE MAY NOT BE DISTRIBUTED."  Id.  In conjunction with receiving that correspondence from Terma, OSSN wrote to ESA's representative, Mr. Affaitati, to inquire how Terma obtained OSSN's Proprietary Software from ESA without that software having been integrated into a complete application developed by ESA, in which case it would have been impossible for Terma to use OSSN's Proprietary Software to build a library.  OSSN also informed ESA that if Terma is an independent entity from ESA, ESA's distribution of OSSN's Proprietary Software to Terma violated the 9661 License Agreement.  (Sigona Dec., ¶ 18).  In response, on April 28, 2006, Mr. Affaitati acknowledged that Terma might have to enter into a license agreement with OSSN.  Id.

OSSN reiterated to ESA that its distributions of OSSN's Proprietary Software to ESA customers outside of a "complete application" developed by ESA violated ESA's License Agreements with OSSN.  Id.  Mr. Affaitati responded that "[o]f course, if our current license agreement is not enough to cover our needs, we will apply for the 'Toolkit Builder license' as you proposed" and subsequently asked for cost and conditions associated with the Toolkit Builder License, which OSSN provided.  Id.

In a subsequent series of communications in 2006, OSSN specifically asked Mr. Affaitati which components of OSSN's Proprietary Software ESA distributed to third parties with the SLE API library.  (Sigona Dec., ¶ 19).  In response, Mr. Affaitati provided a spreadsheet identifying many components of OSSN Proprietary Software ESA had distributed to third parties, thereby admitting ESA's wrongdoing.  (Sigona Dec., ¶ 20, Ex. K). [2]

Based on the numerous communications between OSSN and ESA in March 2004 and in 2006, ESA was well aware that the License Agreements restricted ESA's ability to distribute OSSN's Proprietary Software and required either that any recipients of OSSN's software components, other than when integrated into a complete application developed by ESA, obtain an independent license from

---

[2] OSSN believes that discovery will reveal that ESA made numerous wrongful distributions of OSSN's Proprietary Software in addition to those specifically set forth herein.

OSSN or that ESA pay OSSN royalties for each such distribution pursuant to an agreement that ESA would need to enter into with OSSN permitting such distribution.   ESA nonetheless knowingly and willfully redistributed OSSN's Proprietary Software to third parties, and breached the License Agreements.

<u>**ARGUMENT**</u>

### I.      STANDARD

On a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss, a Court may consider matters outside of the pleadings, but must nonetheless accept as true all the factual allegations contained in the complaint.   <u>Osseiran v. Int'l Fin. Corp.</u>, 498 F. Supp. 2d 139, 143 (D.D.C. 2007) (finding that the International Finance Corporation waived immunity from promissory estoppel and breach of confidentiality claims), <u>aff'd</u> 552 F.3d 836 (D.C. Cir. 2009).   Once a foreign defendant asserts the jurisdictional defense of immunity, a court must then determine if the defendant has waived immunity for the purposes of plaintiff's lawsuit.  <u>Id.</u>

### II.      U.S. LAW, NOT THE ESA CHARTER, GOVERNS THE SCOPE OF IMMUNITY AND DICTATES WHEN AND HOW AN INTERNATIONAL ORGANIZATION MAY WAIVE IMMUNITY

The IOIA states:

> International organizations, their property and their assets, wherever located and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments,

**except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.**

22 U.S.C. § 288a(b) (emphasis added).  Since the underlined statutory language alone defeats ESA's immunity argument, ESA was less than candid in failing to advise the Court of the existence of the underlined language above, choosing instead to selectively quote only a portion of the statute.

In addition to this statutory language, the United States, through the State Department, has taken the position that international organizations possess only the restrictive immunity provided for by the FSIA, i.e., there is no immunity for an international organization's commercial acts and there certainly is no absolute immunity from suit for international organizations.  (See Point VI below).  In a June 24, 1980 letter to the Equal Employment Opportunity Commission, the State Department Legal Adviser wrote that: "The [FSIA] amended [United States] law by codifying a more restrictive theory of immunity subjecting foreign states to suit in U.S. courts in respect of their commercial activities . . . while continuing their exemption from U.S. jurisdiction for sovereign or governmental activities. . . . international organizations are now subject to jurisdiction of [U.S.] courts in respect of their commercial activities, while retaining immunity for their acts of a public character."  Letter from Robert B. Owen, State Department Legal Adviser, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission

(June 24, 1980), reprinted in 74 Am. J. Int'l L. 917 (1980) (Declaration of Ronald L. Israel, "Israel Dec.", Ex. A).

Under the IOIA, an international organization may waive whatever immunity it has in two ways:  (1) if its own charter waives immunity for the purpose of any proceedings or (2) by entering into a contract with a U.S. entity with language that waives immunity.  U.S. Courts have routinely found waivers under varying circumstances, ranging from where, as here, the international organization has contracted to have disputes heard in the United States (see Bro Tech Corp. v. European Bank for Reconstruction and Dev., CIV. A. 00-2160, 2000 WL 1751094 (E.D. Pa. Nov. 29, 2000) (finding EBRD waived immunity through its contractual relationship with plaintiff)) to where the organization has waived immunity by filing a proof of claim (In re Kaiser Group Int'l Inc., 399 F.3d 558 (3d Cir. 2005) (filing of proof of claim resulted in waiver of immunity for tortious interference, breach of contract, breach of warranty, unjust enrichment, and quantum meruit claims)) to where the organization is held to have waived immunity pursuant to its charter because doing so would be in the best interest of the organization.  See, e.g., Osseiran, 552 F.3d at 840 (IFC waived immunity from promissory estoppel and breach of confidentiality agreement claims); Vila v. Inter-Am. Inv. Corp., 536 F. Supp. 2d 41 (D.D.C. 2008) (IIC waived immunity for claims based on implied contract and unjust enrichment).

Indeed, only four months ago, the United States Court of Appeals for District of Columbia Circuit affirmed the denial of a motion to dismiss on the ground that the IFC waived immunity from promissory estoppel and breach of confidentiality claims. Osseiran v. Int'l Fin. Corp., 552 F.3d 836 (D.C. Cir. 2009). In Osseiran, the parties had not even signed a contract (indeed, the Court dismissed the plaintiff's breach of contract claim for that reason); here, it is undisputed that ESA and OSSN entered into eight separate contracts that are the subject of this lawsuit. When one parses through the various case law analyzing the IOIA, one will notice that factually, the pending matter contains the clearest set of facts to find an express waiver of immunity – it says so right in the contracts.

Since it is the United States that grants immunity to international organizations in the United States (as well as to foreign sovereigns), it is also the United States, and not the international organization, that dictates the scope of such immunity and how an international organization may waive immunity. Osseiran, 552 F.3d at 840 ("it [i]s for the federal judiciary to decide whether an international organization's invocation of immunity for certain actions would interfere with its mission."). ESA is simply wrong when it states that "The ESA Convention describes the method by which the ESA may waive its statutorily granted immunity." (ESA Br. at 2). Indeed, the Osseiran Court clearly stated the opposite:

The organization's view of waiver of immunity is not conclusive.  <u>Osseiran</u>, 552 F.3d at 840.

>   **III.   ESA WAIVED WHATEVER IMMUNITY IT MAY HAVE HAD WHEN IT NEGOTIATED AND ENTERED INTO EIGHT WRITTEN CONTRACTS WITH OSSN, EACH OF WHICH PROVIDE FOR JURISDICTION AND VENUE IN NEW JERSEY FOR THE RESOLUTION OF ALL DISPUTES**

ESA expressly waived immunity when it entered into the License Agreements with OSSN, each providing expressly that the Agreement shall be governed by the laws of the State of New Jersey and each providing for the resolution of disputes in New Jersey, with License Agreements 9661, 7936, and 8117 specifically providing for ESA's consent to the exclusive jurisdiction of New Jersey courts or the Federal court for the district of New Jersey.  (<u>See</u> Sigona Dec., Exs. A-H and pages 8 to 9 above).  ESA does not dispute that it entered into any of these contracts with OSSN or that those contracts contained express language by which ESA knowingly submitted to the jurisdiction of this Court.[3]  This alone is

---

[3] The Third Circuit has established a strong preference for enforcing forum selection/jurisdiction clauses.  <u>Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.</u>, 709 F.2d 190, 202 (3d Cir. 1980); <u>Int'l Bus. Software Solutions, Inc. v. Sail Labs Tech., AG</u>, 440 F. Supp. 2d 357, 362 (D.N.J. 2006) ("A forum selection clause is presumptively valid and enforceable, unless the party resisting enforcement can "make a strong showing, either that the forum thus selected is so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court, or that the clause was procured through fraud or overreaching.")  None of the above exceptions are present in this case and, regardless, they have not been raised by ESA.

sufficient to constitute a waiver of whatever immunity ESA had.  Bro Tech, 2000 WL 1751094 at *4.

In Bro Tech, plaintiffs sought funding from the European Bank for Reconstruction and Development ("EBRD") to finance their manufacturing company in Romania.  Bro Tech, 2000 WL 1751094 at *1.  Approximately five years later, in 1999, plaintiffs tried to re-finance the loans but EBRD refused and the joint venture became insolvent.  Id.  The plaintiffs sued EBRD for breach of fiduciary duty, fraudulent misrepresentation, negligent misrepresentation, tortious interference, conspiracy, and aiding and abetting against a third party.  Id. at *2.  After finding that the EBRD was subject to the IOIA, the Court concluded that the EBRD waived its immunity by contractually agreeing to resolve its disputes in arbitration.  Id. at *6.  Similarly, here, ESA has waived immunity by entering into dispute resolution provisions with OSSN, the only difference being that ESA agreed to the jurisdiction of the Courts of New Jersey.[4]  (Sigona Dec., Exs. A-H).

---

[4] While the license and maintenance agreements for License No. 5941, signed July 2, 1996, provide for arbitration of disputes in Princeton, New Jersey, that issue is not before the Court.  Unlike the defendant in Bro Tech, which moved to dismiss the complaints on two separate grounds:  (1) immunity and (2) the arbitration provisions in the contracts, ESA only moved to dismiss the complaint on the ground of immunity.  See ESA's Notice of Motion, attached to Israel Cert. at Ex. B.  ESA has thus waived its right to move to dismiss on that ground and may not do so in its reply brief.  See Gerlach v. Snee, No. 06-0881(JLL), 2007 WL 1488773, *2 n.4 (D.N.J. May 18, 2007) (court did not consider defendants' additional argument raised in reply brief because "[a] moving party may not raise new issues in a reply brief that it should have raised in its initial brief."); Bayer AG

The <u>Bro Tech</u> case was thoroughly analyzed in <u>In re Dinastia, L.P.</u>, 381 B.R. 512 (S.D. Tex. 2007), distinguishing <u>Bro Tech</u> and <u>Osseiran</u> on the sole ground that in <u>Dinastia</u> there was no contractual privity between the plaintiff and the defendant (the International Finance Corporation or "IFC"). The <u>Dinastia</u> Court found no waiver of immunity because, unlike here, there was no direct or indirect relationship, communications or negotiations, and no course of business dealings between the parties, intimating that it would have come to an opposite conclusion had there been the type of contractual relationship present in this case, as well as in <u>Bro Tech</u> and <u>Osseiran</u>.

ESA either intentionally misstated the holding of <u>Bro Tech</u> or simply misread the entire decision when it stated in its brief that the Court dismissed the complaint because the EBRD had absolute immunity. <u>See</u> ESA Br. at 10. To the contrary, the Court found an express waiver of immunity and only dismissed the complaint because, unlike here, the EBRD contracts contained arbitration clauses and, unlike here, the EBRD actually sought to dismiss the complaint on the ground

---

v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (court disregarded the argument contained in defendant's reply brief because a passing reference to an issue in an opening brief is not sufficient to put an opposing party on notice); <u>Am. Home Mortgage Corp. v. First Am. Title Ins. Co.</u>, No. 07-01257(JLL), 2007 WL 3349320, *3 n.8 (D.N.J. Nov. 9, 2007) (court did not consider the argument that was raised by defendant for the first time in his reply brief). Of course, the issue of arbitration is irrelevant to the remainder of the License Agreements, each of which expressly provide that ESA consents to the jurisdiction of and is subject to suit in the Courts of New Jersey.

that the dispute needed to be arbitrated.  Bro Tech, 2000 WL 1751094 at *6-7.

Following the reasoning and holding of Bro Tech, if the contracts did not contain

arbitration clauses, the Court would not have dismissed the claims.

Indeed, several cases have held that the only reason for not finding an

express waiver of immunity is because, unlike here, the international organization

did not have an outside contractual relationship with the plaintiff, suggesting that

those courts would have found an express waiver of immunity in cases like this

one.  See, e.g., Mendaro v. World Bank, 717 F.2d 610, 618-20 (D.C. Cir. 1983)

(finding that the World Bank waives immunity to actions arising out of its

contracts and its external commercial contracts and activities given that "potential

investors would be much less likely to acquire the Bank's own securities if they

could not sue the Bank to enforce its liabilities.")); Banco de Seguros del Estado v.

Int'l Fin. Corp., No. 06 Civ. 2427(LAP), 2007 WL 2746808, *6 (S.D.N.Y. 2007)

(after noting that the IFC had a written contract with three individuals and two

entities that provided that disputes against IFC may be brought in any court of the

United States of America, the Court stated that had the plaintiff been a party to the

agreement, it could have enforced that provision of the agreement against IFC).

Additionally, we note that the language in the forum selection/jurisdiction

clauses in the License Agreements covers tort claims, not just contract claims.  It is

well settled law in this Circuit that a forum selection clause, such as the one here:

> This Agreement shall be governed by the laws of the
> state of New Jersey and [ESA] expressly submits to
> jurisdiction therein by process served by mail on [ESA]
> at its above address and agrees that **any dispute arising
> out of this Agreement** shall be subject exclusively to the
> jurisdiction of New Jersey courts or the Federal court for
> the district of New Jersey (emphasis added);

is not limited to merely contract claims, but includes tort claims.  See Crescent Int'l, Inc. v. Avatar Cmtys., Inc., 857 F.2d 943, 944-45 (3d Cir. 1988) (applying forum selection clause to tortious interference, fraud, and unfair competition claims); Coastal Steel Corp., 709 F.2d at 203 (holding that forum selection clauses apply to tort claims that ultimately depend on the existence of a contractual relationship); Re-Source Am., Inc. v. Corning Inc., Civil No. 06-3485 (RBK), 2007 WL 174714, *5-6 (D.N.J. Jan. 19, 2007) (holding that forum selection clause applied to all claims in the litigation as "the pleadings indicated that the tort claims alleged arise out of events that transpired during the contractual period" and thus would not have occurred "absent the contractual relationship"); Vangura Kitchen Tops, Inc. v. C & C N. Am., Inc., No. 08-CV-1011, 2008 WL 4540186, *5 (W.D. Pa. Oct. 7, 2008) (all claims "that are 'closely related' to the claims for breach of the contract containing the forum selection clause" are encompassed in the clause). Each of the tort claims in the present lawsuit transpired during the contractual period and the activities arose out of the software that OSSN licensed to ESA in the License Agreements.  Any argument that the forum selection clause here does

not apply to OSSN's tort claims against ESA "lacks merit."  Re-Source Am., 2007 WL 174714 at *5.

ESA has acknowledged that it entered into the License Agreements and does not dispute that its employees, including the Head of ESA's Space Operations Center (ESOC) Contracts, ESA's Technical Officer, the Head of ESA's Infrastructure Section, and the Head of ESA's Purchase Offices (titles that ESA bestowed on each of these individuals, thereby cloaking them with apparent, if not actual, authority) had authority to enter into each of the License Agreements, each of which contain forum selection/jurisdiction clauses providing for the resolution of disputes in New Jersey.  To the extent ESA suggests that its Council did not specifically consent to the forum selection/jurisdiction clauses, it is of no moment since ESA does not dispute that it entered into the License Agreements or that the License Agreements are binding; indeed, ESA has reaped the benefits of those License Agreements.  Additionally, since the License Agreements have existed for at least five and upwards of thirteen years, and since ESA has already received the benefits from each of the License Agreements, ESA's suggestion that the Council needed to agree to the forum selection/jurisdiction clauses appears to be nothing but a mere afterthought concocted solely because ESA has no meritorious defense to the complaint.

Moreover, as stated above, it is U.S. law, not ESA's charter, that governs the scope of immunity (see Osseiran, 552 F.3d at 840) and thus whether under basic U.S. contract law, or if the Court deems necessary to analyze, under the theories of estoppel and ratification, ESA is bound by the acts of its authorized representatives who signed the License Agreements on its behalf.  ESA is bound to the forum selection/jurisdiction provisions of the License Agreements by the doctrine of equitable estoppel because it is fundamentally unfair to allow ESA to now disavow those provisions.  "Estoppel has been defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse."  Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339 (1979) (quoting Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449 (1966)).  Equitable estoppel prevents "a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience."  Carlsen, 80 N.J. at 339 (internal quotations omitted).

Here, ESA entered into the License Agreements with full knowledge of their content, including the forum selection/jurisdiction provisions.  ESA received the benefits of the License Agreements for years while knowing that most of them did

not contain an arbitration provision.   OSSN relied to its detriment on the forum selection clauses of these contracts, because such clauses offer a modicum of protection against just the sort of theft that ESA has engaged in here.   OSSN would not have been willing to enter into these contracts with ESA unless it had the ability to seek redress for violations of the terms of the contracts including, most importantly, unauthorized distributions of its Proprietary Software.

Moreover, by accepting the benefits of the License Agreements long after it knew or should have known that they contained forum selection/jurisdiction clauses, ESA ratified the entirety of the License Agreements, including the forum selection clauses.   Thermo Contracting Corp. v. Bank of N.J., 69 N.J. 352, 361-62 (1976) (It is the well-established rule that a corporation must either ratify a transaction or repudiate it entirely; it may not "pick and choose" only what is advantageous to it from a contract.) (quoting Restatement (Second) of Agency § 82 (1957)).   The Court is empowered to determine that ESA has ratified the contracts at issue here as a matter of law, and should do so here.   See Thermo Contracting, 69 N.J. at 364 (holding that ratification may be determined as a matter of law).

## IV.   ESA'S CHARTER WAIVED WHATEVER IMMUNITY ESA MAY HAVE HAD

While there should be no dispute that ESA expressly waived immunity to this particular suit when it entered into multiple contracts with OSSN, should the Court need to address ESA's charter, it should similarly find that ESA waived, or

at the very least, using ESA's Charter's language, had a duty to waive immunity. The <u>Mendaro</u> Court set forth the standard by which courts should find that an international organization waived (or using the language of ESA's Convention, had a "duty" to waive)[5] immunity, a standard which has come to be known as the "corresponding benefits" test.   <u>Mendaro</u>, 717 F.2d at 617.   <u>Mendaro</u> held that an organization would waive immunity where it received a corresponding benefit that would further the organization's goals.   <u>Id.</u> at 617-18 (finding that "a waiver of immunity with respect to the World Bank's commercial transactions with the outside world is also evident under [the World Bank's Charter]" because the World Bank's guaranteeing of securities "would mean little if beneficiaries of the guarantee could not sue to enforce the Bank's contracts . . ..   Similarly, the commercial reliability of the Bank's direct loans and private loan guarantees would

---

[5] ESA's Convention for the Establishment of a European Space Agency (the "Convention") states, in relevant part:

> The [ESA] shall have immunity from jurisdiction and execution, except to the extent that it shall, by decision of the Council, have expressly waived such immunity in a particular case; the Council has the duty to waive this immunity in all cases where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the [ESA].

> Convention, Annex I, Privileges and Immunities, Article IV.

be significantly vitiated if its debtors and beneficiaries were required to accept the Bank's obligations without recourse to judicial process.").

U.S. Courts have consistently held that a waiver of immunity with respect to commercial transactions with third parties is in the best interests of international organizations "because otherwise private parties would be hesitant to transact business" and thus "hinder an organization's ability to operate in the marketplace." Mendaro, 717 F.2d at 618. Even Atkinson v. Inter-American Development Bank, 156 F.3d 1335 (D.C. Cir. 1998), cited by ESA, held that an international organization would waive immunity in suits based on commercial transactions with the outside world, where the benefits of a waiver would outweigh the costs:

> If this immunity were not waived [,] the Bank would be unable to purchase office equipment or supplies on anything other than a cash basis . . .. Such a restriction would unreasonably hobble its ability to perform the ordinary activities of a financial institution operating in the commercial marketplace.

Atkinson, 156 F.3d at 1338 (quoting Mendaro, 717 F.2d at 618).

Similarly, the Bro Tech Court stated that

> [I]n order to attract investors around the world, the EBRD must provide some sort of security to them, protecting the investors from unreasonable and arbitrary action by the EBRD.  If the EBRD could induce participation in any venture, and then act with impropriety towards the investors without any repercussions, then it is unlikely that any commercial establishment would wish to interact with them.  Instead it is clear that the EBRD must waive immunity to some

> extent for transactions such as the one sub judice. The
> "corresponding benefit" which the EBRD receives from
> waiving immunity is their ability to function in the
> international, commercial marketplace.

Bro Tech, 2000 WL 1751094 at *4.  See also Osseiran, 552 F.3d at 840 ("parties

may hesitate to do business with an entity insulated from judicial process; promises

founded on good faith alone are worth less than obligations enforceable in court.").

In Osseiran v. Int'l Finance Corp., 498 F. Supp. 2d 139, 144 (D.D.C. 2007),

the District Court found a waiver of immunity even though there was no binding

written contract between Osseiran and IFC because a "waiver of immunity for

litigation arising from transactions involving a sale of stock to a private investor

provides a clear benefit in attracting additional investors . . . without such waiver,

these investors might be more hesitant to enter into negotiations with IFC to

purchase investments because they could not sue to enforce agreements."

Osseiran, 498 F. Supp. 2d at 144-45.  As the District Court held in Osseiran, the

issue was not whether there was an executed contract with IFC but whether there

was a commercial transaction involving IFC.  Id. at 145 ("Osseiran has complained

not only for enforcement of an alleged agreement that IFC did not abide by, but

also of unfair dealing in the negotiation process.  If IFC were free from being sued

for violating both fair dealing and compliance expectations our contract law

protects, IFC might scarcely find any investors to advance its development

efforts.").

Other courts have held that this limited waiver of immunity applies in the context of commercial contracts.  See, e.g., Vila v. Inter-Am. Inv. Corp., 536 F. Supp. 2d 41, 48 (D.D.C. 2008).  In Vila, the District Court held that the defendant Inter-American Investment Corp. ("IIC") had waived its immunity and the Court distinguished cases, including Atkinson, on the grounds that the plaintiff was an independent contractor seeking payment under contractual theories for services rendered to the international organization rather than an employee of the organization seeking redress for employment-related torts and civil rights violations.  Id. at 49.  In holding that a commercial contract lawsuit is necessary for the proper functioning of the international organization, the court noted:

> If none of the [international organization's] independent contractors were able to resort to the judicial process, they would have no other recourse and may grow wary of doing business with the [international organization] "on anything other than a cash basis."

Id. (quoting Mendaro, 717 F.2d at 618).

Vila found that the plaintiff's claims for breach of implied contract and unjust enrichment were the very claims that Mendaro held were those subject to a waiver by an international organization, i.e. claims based on commercial transactions between an international organization and an independent, outside vendor, and thus held that the IIC was not immune for those causes of action.  Vila, 536 F.Supp. 2d at 48 (citing Mendaro, 717 F.2d at 618).  Notably, while Atkinson

and Mendaro set the framework for analyzing when an international organization waives immunity, each is distinguishable on its facts as neither involved, as here, a contractual relationship between an international organization and an outside contracting party.  In Atkinson, the plaintiff was a third party seeking to garnish the wages of an Inter-American Development Bank employee and in Mendaro, the plaintiff was an employee.

ESA, no different from other international organizations subject to the IOIA, receives a corresponding benefit for waiving its immunity with outside contractors such as OSSN.  If ESA can enter into contracts in order to obtain a company's proprietary software and then willfully breach the contract and commit torts by wrongfully converting the software and distributing it, and if there are no repercussions for ESA's conduct, then it is unlikely it will be able to do business in the international, commercial marketplace.  See Bro Tech, 2000 WL 1751094 at *4.  Private parties would also be hesitant to transact business with ESA.  See Mendaro, 717 F.2d at 618.  Also, ESA would be unable to obtain the software and computer services it needs to function.  Certainly OSSN would not have entered into a business transaction with ESA for only $25,000 if it knew that the result would be that ESA would be immune from stealing its Proprietary Software and causing OSSN millions of dollars of damage.

ESA knows full well the importance of waiving immunity. That is why, contrary to ESA's brief (at p. 5 n.3), ESA actually has one of the broadest conventions of all international organizations, actually waiving immunity not only for contractual relationships but also for certain non-contractual torts such as car accidents and attachment actions with respect to salaries of staff members that other international organizations will not waive. Compare Atkinson, 156 F.3d at 1340 (international organization immune from proceeding to garnish wages of employee); Inversora Murten, S.A. v. Energoprojekt-Niskogradnja Co. Ltd., 264 Fed. App'x 13, 14 (D.C. Cir. 2008) (international organization immune from proceeding to attach loan moneys from organization to judgment debtor); Peterson v. Islamic Republic of Iran, 563 F. Supp. 2d 268, 276 (D.D.C. 2008) (World Bank, IFC, and IMF all immune from suit to attach loan moneys from organization to judgment debtor).

The same corresponding benefit analysis should apply to the tort claims OSSN has brought against ESA. Mendaro, 717 F.2d at 620 (finding that the World Bank waives immunity to actions arising out of its external commercial contracts and activities). "The ordinary meaning of the phrase 'arising in relation to' is simple . . . i.e., that the origin of the dispute has some logical or causal connection" to the contract." John Wyeth & Brother Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997) (internal quotation and citations omitted).

There is very little, if any, case law analyzing tort claims against international organizations – indeed the Vila Court stated that it conducted independent research that failed to unearth direct authority on this issue. Vila, 536 F. Supp. 2d at 49. In Vila, the Court held that defamation claims (and tortious interference claims that, in that particular case, were factually akin to a defamation claim) would not have a corresponding benefit to IIC. Id. Here, however, the tortious conduct is directly related to the contractual relationship between OSSN and ESA – the tortious conduct is ESA converting OSSN's property and redistributing the very property that it obtained through its contractual license agreements. ESA's tortious conduct could not have occurred but for its entering into a contractual relationship with OSSN because otherwise it would not have had OSSN's Proprietary Software. In this context, the tort claims brought by OSSN support the corresponding benefit test. If ESA does not waive immunity for torts arising out of its business relationships, then no third party would enter into license agreements with ESA because they would not be able to protect wrongful distributions of software or copyright infringement except by enforcing terms of a contract. Of course, this theoretical discussion is moot since the broad language of the License Agreements' forum selection/jurisdiction provisions shows that the contractual waiver of immunity is not limited to contract claims. See, e.g.,

Crescent Int'l, 857 F.2d at 944-45; Coastal Steel Corp., 709 F.2d at 203; Re-Source

Am., 2007 WL 174714 at *5-6; Vangura Kitchen Tops, 2008 WL 4540186 at *5.

## V.     PUBLIC POLICY CONCERNS SUPPORT OSSN

While public policy concerns are not part of the waiver of immunity

analysis, if the Court looks at public policy as a factor, it can only support OSSN

being allowed to continue with its lawsuit.   Public policy weighs in favor of

allowing an aggrieved United States and, here, New Jersey citizen to obtain legal

redress, especially in a case such as here where the defendant has already admitted

its wrongdoing.    ESA's position is antithetical to due process norms and

contemporary notions of making foreign governments and international

organizations more, not less, accountable for their actions.   See generally Steven

Herz, International Organizations in U.S. Courts:  Reconsidering the Anachronism

of Absolute Immunity, 31 SUFFOLK TRANSNAT'L L. REV. 471 (2008).  Moreover,

if this Court does not allow OSSN to proceed with its lawsuit, it may have no other

recourse as it is unclear whether OSSN would be able to bring a claim against ESA

in a European Court.

## VI.    ESA DOES NOT HAVE IMMUNITY FROM SUIT IN THIS
##        CASE

While for the purposes of this motion, OSSN acknowledges that ESA is

subject to the IOIA pursuant to 22 U.S.C § 288(f), OSSN does not agree that ESA

has absolute immunity subject to its waiver of such immunity.   To the contrary,

OSSN contends that the clear language of the IOIA and the drafter's intent evidence that the IOIA was subsequently limited in 1976 to the privileges and immunities granted to foreign sovereigns under the Foreign Sovereign Immunities Act ("FSIA"), including the FSIA's commercial activity exception.

### A.    There is No Absolute Immunity Under the IOIA as of 1976

In order to determine whether the IOIA was itself limited by the FSIA, the starting point is the language in the IOIA that says international organizations "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."   22 U.S.C. § 288a(b) (2008).   The plain language of this statute is that international organizations have neither greater nor lesser immunity than that of foreign governments.  22 U.S.C. § 288 et seq., (2008). Since immunity for foreign governments was codified by the FSIA in 1976, it too altered the scope of immunity of international organizations under the IOIA.  To the extent that cases, including Atkinson, say otherwise – suggesting that the scope of immunity under the IOIA was fixed as of 1945 – OSSN suggests that such decisions were wrong.  See Herz, Reconsidering the Anachronism of Absolute Immunity, at 497-98.

Indeed, legislative history and subsequent non-case materials show that Congress intended the IOIA to incorporate subsequent changes to the body of law concerning foreign sovereign immunity.

First, and perhaps the clearest proof of the erroneous holding in <u>Atkinson</u>, is Congress' statements contained in a House Report issued on the same day as the <u>Atkinson</u> decision, and thus not before the <u>Atkinson</u> Court.  On the same day <u>Atkinson</u> was decided, Congress passed the International Anti-Bribery and Fair Competition Act, Pub. L. 105-366 (codified as amended at 15 U.S.C. §§ 78dd-ff), amending the Foreign Corrupt Practices Act (the "1998 FCPA Amendments"). "[T]his legislation addresses the issue of privileges and immunities [for IOIA institutions engaged in commercial activities] and clarifies the law on this issue." H.R. Rep. No. 105-802, 105th Cong., 2d Sess. 1998, 1998 WL 710062 (Leg. Hist.), *13 (emphasis added). In section 5(c) of that legislation, Congress determined that "an international organization providing commercial communication services . . . shall not be accorded immunity from suit or legal process for any act or omission taken in connection with [such commercial activities]." <u>Id.</u> at *7 (emphasis added).

Under the section of the Commentary accompanying the text of the statute in the House Report titled "Privileges and Immunities," the House Report says:

> Under U.S. law, international organizations such as INTELSAT and INMARSAT[6] generally have the same immunity as foreign governments, and the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., provides that foreign governments are not immune for actions taken in connection with their commercial activities. However, there is a lack of case law on this issue. It is particularly important to resolve this issue…." H.R. Rep. 105-802 at *13.

Later in the House Report (*15), it states that while "the IOIA affords international organizations the same immunity as foreign governments, the FSIA did not explicitly mention the IOIA. . . . This legislation helps define the scope of that immunity." Based on this, it seems quite unlikely that the Atkinson Court would have ruled the way it did had it had the benefit of Congress' interpretation of the IOIA.

Second, the United States itself has taken the position that international organizations now receive only the restrictive immunity provided for by the FSIA. In a June 24, 1980 letter to the Equal Employment Opportunity Commission, the State Department Legal Adviser wrote that: "The [FSIA] amended [United States] law by codifying a more restrictive theory of immunity subjecting foreign states to suit in U.S. courts in respect of their commercial activities . . . while continuing

---

[6] Both of these organizations are subject to the IOIA. See Exec. Order No. 11,966, 42 C.F.R. 4331 (1977) (designating INTELSAT as an international organization pursuant to IOIA); Exec. Order No. 12,238, 1980-43 I.R.B. 22 (1980) (designating INMARSAT as an international organization pursuant to the IOIA).

their exemption from U.S. jurisdiction for sovereign or governmental activities . . ..
Under this view, international organizations now are subject to United States
jurisdiction for their commercial activities, but retain immunity for their public
acts."  Letter from Robert B. Owen, State Department Legal Adviser, to Leroy D.
Clark, General Counsel, Equal Employment Opportunity Commission (June 24,
1980), reprinted in 74 AM. J. INT'L L. 917 (1980).  (Israel Dec., Ex. A.)

Thus, while Atkinson and its progeny may be correct that internal
employment suits and suits that are not based upon a contractual or commercial
relationship are immune from suit, the cases are incorrect that the IOIA grants
absolute immunity, especially, as here, where there is a contractual relationship
between the parties and the underlying conduct is commercial activity.  Several
recent law review articles have articulated other bases for suggesting that the
nature of international organization immunity under the IOIA was indeed limited
upon enactment of the FSIA and that Atkinson was wrong to hold otherwise.  See
e.g., Herz, Reconsidering the Anachronism of Absolute Immunity, at 496-98;
Kevin M. Whiteley, Holding International Organizations Accountable Under the
Foreign Sovereign Immunities Act:  Civil Actions Against the United Nations for
Non-Commercial Torts, 7 WASH. U. GLOBAL STUD. L. REV. 619 (2008).

Based on the above, the IOIA incorporates the commercial activities
exception to the principle of foreign sovereign immunity.  The Atkinson Court

understandably could not so hold because it was not properly or fully briefed. A more complete examination of the IOIA legislative history than the one provided to the <u>Atkinson</u> Court reveals that Congress used the "same as" language to incorporate subsequent changes to the law of foreign sovereign immunity, and did not intend IOIA immunity to be "fixed" as of 1945. Those subsequent changes include the formal adoption of the "restrictive" theory of foreign sovereign immunity, and the codification of that theory in the FSIA. Therefore, ESA is not immune from claims—such as the one at issue here—arising from or relating to its commercial activities.

To date, no Court has been willing to undertake a review of non-precedential materials and rule that <u>Atkinson</u> was wrong. This Court, however, has the opportunity and the responsibility of doing so.

### B. ESA has no Immunity in this Case Based upon FSIA's Commercial Activity Exception

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1601, <u>et</u> <u>seq.</u> provided express limitations to foreign government's immunity from legal process. For present purposes, the most important limitation is the so called "commercial activity" exception, whereby a foreign government is not immune from lawsuits regarding commercial acts that they could engage in as a private party, as long as those acts have sufficient contact to the United States. <u>See</u> 28 U.S.C. § 1605(a)(2). Specifically, foreign governments do not have immunity in any of the following

three scenarios:  (1) when its acts constitute commercial activity in the United States; (2) where there is an act performed in the U.S. in connection with a commercial activity elsewhere; or (3) where there is an act performed outside of the U.S. in connection with a commercial activity of the foreign state elsewhere, if that act causes a direct effect in the United States.  Id.  Additionally, there is no immunity where the claim is based upon property rights taken in violation of international law and that property has a specified connection to the United States. 28 U.S.C. § 1605(a)(3).  In this case, each of these four scenarios apply.  ESA entered into a contract in the United States and provided for resolution of disputes in New Jersey.  ESA then proceeded to willfully steal and wrongfully distribute OSSN's Proprietary Software thereby causing damage in the United States.  As there would be no immunity for a foreign sovereign under the FSIA, there is similarly no immunity for ESA under the IOIA.  See, e.g., Intel Corp. v. Commonwealth Scientific & Indus. Research Org., 455 F.3d 1364, 1369-71 (Fed. Cir. 2006) (holding that the act of negotiating a patent license agreement with U.S. corporations is a "commercial activity" under the FSIA); see generally Republic of Argentina v. Weltover Inc., 504 U.S. 607, 614 (a "commercial activity" is an exercise of "powers that can also be exercised by private citizens").

## <u>CONCLUSION</u>

For the foregoing reasons, OSSN respectfully requests that the Court deny the Motion to Dismiss in all respects.

Respectfully submitted,

Wolff & Samson PC
Attorneys for Plaintiff OSS Nokalva, Inc.


By    /s/ Ronald L. Israel      
Dated: May 1, 2009            Ronald L. Israel