**NOT FOR PUBLICATION**

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| OSS NOKALVA, INC., | CIVIL ACTION NO. 08-3169 (MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. |  |
| EUROPEAN SPACE AGENCY, |  |
| Defendant. |  |

**COOPER, District Judge**

Plaintiff, OSS Nokalva, Inc. ("OSS"), commenced this action against defendant, European Space Agency ("ESA"), to, inter alia, recover damages for alleged breaches of contract. (Dkt. entry no. 1, Compl.) ESA now moves to dismiss the Complaint for (1) lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), contending it is immune from suit under the International Organizations Immunity Act ("IOIA"), and (2) failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). (Dkt. entry no. 16.) OSS opposes the motion. (Dkt. entry no. 19.) The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). The Court, for the reasons stated herein, will deny the motion.

## BACKGROUND

ESA, an international organization comprised of various member states, was established "to provide for and to promote, for exclusively peaceful purposes, cooperation among European

States in space research and technology." ESA Convention, Art. II. (Dkt. entry no. 5, Def. Br. at 3-4.) ESA is led by a council of representatives (the "Council") from member states, and is governed by the ESA Convention, which sets out its policies, procedures, and internal rules. (Id. at 4.)

In order to serve its purpose, ESA is empowered to enter into agreements with outside parties. ESA Convention, Annex I, Art. I. The ESA Convention, however, provides that ESA is immune from suit except in certain enumerated situations. Id., Annex I, Art. IV.

ESA contracted with OSS to provide, inter alia, software and proprietary tools and information to assist ESA in developing its own software. (Compl. ¶ 1, 5; dkt. entry no. 19, Sigona Decl. ¶ 2.) The parties executed four sets of License Agreements and corresponding Software Maintenance Agreements (the "Agreements") between February 1996 and February 2004: (1) License Number 5941, executed on February 7, 1996 (the "5941 Agreement"); (2) License Number 7936, executed on March 29, 2000; (3) License Number 8117, executed on July 20, 2000; and (4) License Number 9661, executed on February 9, 2004. (Compl. ¶ 3.)

In the event of disagreement between the parties, the 5941 Agreement provides that "[a]ny dispute which cannot be settled amicably shall be submitted to arbitration . . . in Princeton (New Jersey) in accordance with the rules of the International

2

Chamber of Commerce." (Sigona Decl., Ex. A at 2.) Rather than an arbitration clause, the subsequent three agreements provide identical forum selection clauses:

> This Agreement shall be governed by the laws of the state of New Jersey and Customer expressly submits to jurisdiction therein . . . and agrees that any disputing arising out of this Agreement shall be subject exclusively to the jurisdiction of New Jersey courts or the Federal court for the district of New Jersey.

(Id., Ex. C at 2; id., Ex. E at 2; id., Ex. G at 2.) The Agreements further provide that "[n]either the Program(s) nor this Agreement may be assigned, sublicensed or otherwise transferred by Customer without prior written consent from OSS." (Id., Ex. A at 1; id., Ex. C at 1; id., Ex. E at 1; id., Ex. G at 1.)

OSS filed the Complaint on May 22, 2008, alleging, inter alia, that ESA (1) breached the Agreements by distributing unintegrated OSS software to third parties, and (2) failed to compensate OSS for certain software, as well as for the distribution of OSS's software to the third parties. (See Compl.) ESA, however, contends that the Complaint should be dismissed, inter alia, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) because the IOIA provides ESA with immunity from suit. (Def. Br. at 6-8.) OSS, to the contrary, asserts that (1) ESA is not entitled to immunity, and (2) if ESA is found to be entitled to immunity, ESA waived that immunity. (Dkt. entry no. 19, Pl. Br. at 7-9.)

**DISCUSSION**

**I.    Legal Standards**

    **A.    Rule 12(b)(1)**

A defendant may move to dismiss a claim for lack of subject matter jurisdiction under Rule 12(b)(1).  Fed.R.Civ.P. 12(b)(1).  Such motion may be made at any time.  Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 437-38 (D.N.J. 1999).  The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction.  Id. at 438.  Under this standard, a court assumes that the allegations in the complaint are true, and may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction.  Cardio-Med. Assoc., Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir. 1983); Iwanowa, 67 F.Supp.2d at 438.  Questions of immunity are jurisdictional in nature.  Bro Tech Corp. v. European Bank for Reconstruction & Dev., No. 00-2160, 2000 U.S. Dist. LEXIS 17049, at *8 (E.D. Pa. Nov. 29, 2000).  "Conflicting written and oral evidence may be considered and a court may decide for itself the factual issues which determine jurisdiction."  Id.

    **B.    Rule 12(b)(6)**

The Court may also dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P.

12(b)(6). On a Rule 12(b)(6) motion to dismiss, a court generally must accept as true all of the factual allegations in the complaint, and must draw all reasonable inferences in favor of the plaintiff. Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir. 2004); Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001). A court, however, need not credit bald assertions or legal conclusions alleged in the complaint. Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citation omitted). While plaintiffs are not required to plead all the facts serving as a basis for the claim, the complaint must "provide the opponent with fair notice of a claim and the grounds on which that claim is based." Kanter, 489 F.3d at 175; see also Allia v. Target Corp., No. 07-4130, 2008 WL 1732964, at *3 (D.N.J. Apr. 10, 2008).

**II. ESA's entitlement to absolute immunity under the IOIA**

The IOIA, enacted in 1945, codified the policy of providing immunity to "international organizations." 22 U.S.C. § 288. The IOIA entitles so-designated organizations to:

> enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may

>    expressly waive their immunity for the purpose of any
>    proceedings or by the terms of any contract.

Id. § 288a(b).  To receive such designation, an organization must be recognized through an "appropriate Executive Order as being entitled to enjoy the privileges, exemptions, and immunities" provided by the IOIA.  Id. § 288.  ESA is a designated "international organization" under the IOIA.  Id. § 288f-1.

The parties, however, disagree on the extent to which an "international organization" is immune to suit under the IOIA. ESA argues that it has "virtually absolute immunity."  (Def. Br. at 9.)  OSS, to the contrary, asserts that ESA possesses only the restrictive immunity provided for under the Foreign Sovereign Immunities Act ("FSIA"), 22 U.S.C. § 1602 et seq.  (Pl. Br. at 32-38.)

The IOIA expressly states that international organizations are to be given the "same immunity . . . as is enjoyed by foreign governments."  22 U.S.C. § 288a(b); see Atkinson v. Int'l Dev. Bank, 156 F.3d 1335, 1340 (D.C. Cir. 1998) (finding this statement to be the "key phrase" in determining whether the international organization is entitled to absolute immunity); Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *11-*12.  At the time of the enactment of the IOIA, foreign sovereigns were provided absolute immunity. Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *12.  Foreign sovereigns today, however, are given a more restrictive level of immunity, requiring a case-by-case analysis,

rather than absolute immunity.  See FSIA, 22 U.S.C. § 1602 et seq. (codifying, in 1976, the State Department's policy of restrictive immunity for foreign sovereigns); Atkinson, 156 F.3d at 1340; Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *11-*12. The courts thus have been left to determine whether the scope of immunity given under the IOIA should be interpreted to encompass the absolute immunity that existed in 1945 or the evolving changes in the law, i.e. the policy of restrictive of immunity under the FSIA.  Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *11-*12; cf. Bisson v. United Nations, No. 06-6352, 2007 U.S. Dist. LEXIS 54334, at *32-*33 (S.D.N.Y. July 27, 2007) (refusing to rule on which law dictates).

    The D.C. Circuit, in Atkinson v. Int'l Dev. Bank, examined the text and legislative history of the IOIA, and determined that it should be interpreted to provide immunity according to the state of the law at the time of enactment.  156 F.3d at 1341. The Court reasoned that, by allowing "the President [to] retain[] authority to modify, condition, limit, and even revoke the otherwise absolute immunity of a designated organization," Congress had already provided a mechanism to alter the immunity given to international organizations.  Id.; see id. at 1342 ("The FSIA is beside the point because it does not reflect any direct focus by Congress upon the meaning of the earlier enacted provisions of the IOIA.") (quotation and citation omitted).  This

7

reasoning was followed by the Eastern District of Pennsylvania in Bro Tech Corp. v. European Bank for Reconstruction & Dev. See 2000 U.S. Dist. LEXIS 17049, at *12.

OSS contends that legislative history and certain "non-case materials" demonstrate that Congress instead intended the IOIA to incorporate subsequent changes to the body of law regarding foreign sovereign immunity. (Pl. Br. at 33.) OSS argues that the legislative history of the International Anti-Bribery and Fair Competition Act, enacted the same day the Atkinson decision was filed, shows Congress's intent to define the scope of immunity provided under the IOIA as the same level of immunity provided by the FSIA. See H.R. Rep. No. 105-802 (1998). (Pl. Br. at 34-35.) The legislative history of this Act, however, discusses immunity in the context of only two international organizations – the International Telecommunications Satellite Organization and the International Mobile Satellite Organization – and thus is not persuasive as to ESA's level of immunity under the IOIA. See H.R. Rep. No. 105-802, at 13.

OSS also relies on a letter written by a member of the State Department in 1980 (the "Letter"), opining that "[b]y virtue of the FSIA, and unless otherwise specified in their constitutive agreements, international organizations are now subject to the jurisdiction of our courts in respect of their commercial activities, while retaining immunity for their acts of a public

8

character."  Letter from Robert B. Owen, State Department Legal Advisor, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission (June 24, 1980), reprinted in 74 Am. J. Int'l L. 917 (1980).  (Pl. Br. at 35-36.)  Although statutory interpretations by the Executive Branch are ordinarily entitled to great weight, courts are not bound to such interpretations. See Mendaro v. World Bank, 717 F.2d 610, 620-21 (D.C. Cir. 1983) (considering the Letter, in another context, in determining whether World Bank waived its immunity).  Courts, moreover, have since considered the argument described in the Letter and determined that international organizations are entitled to absolute immunity.  See Atkinson, 156 F.3d at 1339-42; Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *11-*13.  The Court thus finds the "non-case materials" and legislative history relied on by OSS not persuasive as to the level of immunity provided under the IOIA.  Accordingly, the Court follows Atkinson and finds that ESA is entitled to absolute immunity.

### III. Waiver of Absolute Immunity

An international organization's absolute immunity under the IOIA is subject to two sources of limitation: (1) express waiver by the international organization; and (2) specific limitation by the President.  Mendaro, 717 F.2d at 613-14; see 22 U.S.C. § 288. Here, because there is no indication that ESA's absolute immunity

has been curtailed by a President, the Court need only consider whether ESA expressly waived its absolute immunity.

The ESA Convention provides that ESA is generally immune from "jurisdiction and execution," except, inter alia,

> to the extent that it shall, by decision of the Council, have expressly waived such immunity in a particular case; the Council has the duty to waive this immunity in all cases where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the Agency.

ESA Convention, Annex I, Art. IV ¶ 1(a).[1]

The Court must now determine if this broad language encompasses OSS's claims against ESA. Osseiran v. Int'l Fin. Corp., 552 F.3d 836, 840 (D.C. Cir. 2009) (stating it is "for the federal judiciary to decide whether an international organization's invocation of immunity for certain actions [interferes] with its mission"). The default rule is: "immunity should be construed as not waived unless the particular type of suit would further the [international organization's] objectives." Atkinson, 156 F.3d at 1338.

> Since the purpose of the immunities accorded international organizations is to enable the organizations to fulfill their functions, applying the same rationale in reverse, it is likely that most organizations would be unwilling to relinquish their

---

[1] The ESA Convention also provides that immunity is waived for: (1) civil actions by third parties for damage arising from an automobile accident; (2) enforcement of arbitration awards; and (3) attachment of the salaries and emoluments owed by ESA to employees. ESA Convention, Annex I, Art. IV ¶ 1(b)-(d).

>    immunity without receiving a corresponding benefit
>    which would further the organization's goals.

Mendaro, 717 F.2d at 617.  "A nonspecific waiver . . . [thus] should be more broadly construed when the waiver would arguably enable the organization to pursue more effectively its institutional goals."  Id.  "[L]imitations on immunity that subject the organization to suits which could significantly hamper the organization's functions," however, "are inherently less likely to have been intended."  Id.  The Court therefore must analyze whether such a waiver of immunity would provide ESA with any corresponding benefits.  See id. at 614-15; Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *13-*16.

In Mendaro v. World Bank, the Court held that World Bank was immune from an employee's sexual harassment suit because, inter alia, the evidence did not suggest there would be a corresponding benefit for immunity to be waived for suits arising out of the organization's internal operations.  717 F.2d at 617-18; see id. at 618-20 (discussing the burdens such a suit would present).  The Court, however, differentiated employment actions from commercial transactions, stating that immunity would be appropriately waived for an action involving a commercial transaction, such as the "purchase of office equipment or supplies on anything other than a cash basis," "the normal use of telephone and utilities," or any of the "ordinary activities of a financial institution operating in the commercial marketplace."

11

Id. at 618; see also Atkinson, 156 F.3d at 1338-39 (finding that the international organization's immunity was not waived for appellant to garnish the wages of her former husband, an employee of the organization, to satisfy a divorce judgment).

Courts have found international organizations to have waived immunity for certain actions involving commercial transactions. In Bro Tech Corp., involving claims against the European Bank for Reconstruction and Development ("EBRD") for breach of fiduciary duty by a joint venturer, the Court found that the EBRD waived immunity in order to attract investors and provide protection from unreasonable actions.  2000 U.S. Dist. LEXIS 17049, at *13-*16 ("If the EBRD could induce participation in any venture, and then act with impropriety towards the investors without any repercussions, then it is unlikely that any commercial establishment would wish to interact with them.")  The Court found the "corresponding benefit" to the waiver of immunity to be the ability to participate in the international commercial market.  Id.

In Osseiran v. Int'l Fin. Corp., the Court found the International Finance Corporation ("IFC") waived its immunity from promissory estoppel and breach of confidentiality claims concerning the IFC's alleged representations during negotiations for the sale of its investments to private parties.  552 F.3d 836, 837-41 (D.C. Cir. 2009).  The Court, identifying "no unique

countervailing costs," held that a "corresponding benefit" to the waiver of immunity existed because "parties may hesitate to do business with an entity insulated from judicial process." Id. at 840 (noting "promises founded on good faith alone are worth less than obligations enforceable in court"). The Court did not address that there was no written contract between the parties. But see Osseiran v. Int'l Fin. Corp., 498 F.Supp.2d. 139, 145 (D.D.C. 2008) ("The absence of a binding contract may be a defense on the merits, but does not transmogrify a non-immune commercial transaction to an immune non-commercial one.").

In Vila v. Inter-Am. Inv. Corp., the Court held that the Inter-American Investment Corp. ("IIC") waived its immunity for suit by an independent contractor seeking payment for services for breach of implied contract and unjust enrichment claims, but did not waive immunity for defamation and tortious interference claims. 536 F.Supp.2d 41, 48-49 (D.D.C. 2008), aff'd, No. 08-7042, 2009 U.S. App. LEXIS 13279 (D.C. Cir. 2009). The Court reasoned that if the IIC's contractors were not able to resort to the judicial process, they would not do business with the IIC. Id. at 48. The Court, however, found that the claims of defamation and tortious interference did not fit into the classification of "commercial transactions with the outside world" and would not "provide the IIC with any current or future benefit." Id. at 49. The Court determined that the "defamation

13

claim neither further[ed] the [IIC's] objectives or enhance[d] the [IIC's] ability to participate in commercial transactions," and that a tortious interference claim "is analogous to the defamation claim . . . when both the defamation and tortious interference claims arise from the same alleged statements made by employees of the defendant." Id.

OSS argues that ESA waived its immunity for both the contract and tort claims here because it obtained a "corresponding benefit." (Pl. Br. at 24-32.) It contends that if ESA "can enter into contracts in order to obtain a company's proprietary software and then willfully breach the contract and commit torts by wrongfully converting the software and distributing it, and if there are no repercussions for ESA's conduct, then it is unlikely it will be able to do business in the international, commercial marketplace." (Id. at 29.) ESA, however, contends it has not waived its absolute immunity because, inter alia, (1) the limited exceptions specifically enumerated by the ESA Convention do not apply here, (2) ESA would receive no "corresponding benefit" by a waiver of immunity in this situation, and (3) the Court should be hesitant to recognize inadvertent waivers. (Def. Br. at 11-12; dkt. entry no. 20, Def. Reply Br. at 7-9.)

The Court finds that the ESA Convention's enumerated exception, stating the Council has the duty to waive immunity

14

"where reliance upon it would impede the course of justice and it can be waived without prejudicing the interests of the [ESA]" is applicable here.  See ESA Convention, Annex 1 Art. IV ¶ 1(a).  If a corresponding benefit is found to exist as a result of a waiver, the interests of ESA will not be prejudiced.  See Osseiran, 552 F.3d at 837-41; Atkinson, 156 F.3d at 1337-39; Mendaro, 156 F.3d at 614-18; Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *13-*16.  Justice may be impeded, moreover, if OSS is not allowed to continue its suit against ESA, thus channeling the Council's duty to waive immunity.

ESA argues that it receives no "corresponding benefit" from a waiver of immunity.  (Def. Reply Br. at 8-9.)  It notes that OSS permitted ESA to omit the boilerplate forum selection clause in the 5941 Agreement and replace it with an arbitration clause, arguing this shows OSS's willingness to do business with ESA regardless of a waiver of immunity.  (Id.)  OSS, however, did not agree to omit any type of dispute resolution process, it merely changed the type of dispute resolution the parties would be subject to if disputes arose as to the 5941 Agreement.[2]

The Court, moreover, finds that ESA receives a "corresponding benefit" from a waiver of immunity here because

---

[3]  The parties have not moved to proceed to arbitration as to the 5941 Agreement, and the Court offers no opinion here regarding whether a waiver of immunity is limited because of a controlling arbitration agreement.  See Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *16.

15

OSS's claims arise out of commercial activity with ESA that is related to ESA's fulfillment of its objectives.  By providing proprietary software, tools, and information to ESA, OSS provides commercial services to enable ESA to build and advance its organization.  ESA must provide protection from unreasonable and arbitrary actions against outside parties in order to attract the outside parties to provide the materials and supplies needed to conduct business.  Outside parties would be hesitant to do business with ESA if there were no expectations of fair play. See Osseiran, 552 F.3d at 840-41; Vila, 536 F.Supp.2d at 47-48; Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *13-*16.  In return, ESA receives the benefit of the ability to participate in the international commercial marketplace.  See Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *16.[3]

In addition to OSS's contract claims, OSS asserts that (1) ESA "tortiously and unlawfully interfered with [OSS's] customer relationships and prospective economic advantage by making the Distributions to third parties, including possible and prospective customers of [OSS], without regard to [OSS] and its

---

[3] ESA emphasizes the Mendaro Court's declaration that courts should be hesitant to find an express waiver of immunity when such a waiver might subject an organization to a class of suits which would interfere with its functions.  See 156 F.3d at 617.  (Def. Br. at 11.)  The facts here, however, are distinguishable from Mendaro, in which the Court found the international organization would receive no benefit by a waiver of immunity.  See 156 F.3d at 617-18.  After carefully reviewing the party's arguments and legal authority, the Court determines that ESA has waived its immunity here.

contractual and business relations," and (2) ESA's "actions of transferring the Software and Distributions without regard to [OSS's] ownership and the License Agreements were wanton, reckless and grossly negligent."  (Compl. at 7-8.)

    The Court finds that the waiver of immunity here applies to both the contract and tort claims.[4]  The tort claims, as well as the contract claims, arise from the Agreements that state "[n]either the Program(s) nor this Agreement may be assigned, sublicensed or otherwise transferred by Customer without prior written consent from OSS."  (See Sigona Decl., Ex. A at 1; id., Ex. C at 1; id., Ex. E at 1; id., Ex. G at 1.)  The tort claims directly relate to ESA's alleged breach of contract by wrongfully distributing OSS material to third parties.  Cf. Vila, 536 F.Supp.2d at 49 (finding defamation and tortious interference claims arose from certain statements made).  The tort claims thus arise out of ESA's commercial transactions with the outside world.  The Court therefore finds that ESA will benefit by waiving its immunity for both the contract and tort claims as it will enhance ESA's ability to participate in commercial transactions by promoting fair play in the market.  See Bro Tech Corp., 2000 U.S. Dist. LEXIS 17049, at *6-*7, *19-*23 (allowing tort

---

    [4]  ESA did not differentiate between contract claims and tort claims in arguing that all claims should be dismissed. (See Def. Br. at 11-12; Def. Reply Br. at 7-9.)

claims to go to arbitration). Accordingly, the Court will deny the motion.[5]

## CONCLUSION

For the reasons discussed <u>supra</u>, the Court finds that although entitled to absolute immunity, ESA has waived its immunity from suit. The Court, accordingly, will deny the motion and will not dismiss the Complaint pursuant to Rule 12(b)(1) or Rule 12(b)(6). The Court will issue an appropriate Order.

                                    s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge

Dated:   August 4, 2009

---

[5] Because the Court finds that the ESA Convention waived ESA's immunity, the Court does not need to reach the issue of whether the specific Agreements waived ESA's immunity. ESA argues that the Agreements did not waive immunity because only the Council has authority to waive immunity, and the employees who signed the Agreements had no actual or apparent authority to do so. (Def. Reply Br. at 9-13; dkt. entry no. 4, Kreuzberg Aff. at 2-3.) Without reaching a decision, the Court notes that ESA employees, over the course of eight years, knowingly negotiated and agreed to the terms of the Agreements, and acted as if the Agreements were binding and valid. See <u>Squillante & Zimmerman Sales v. Mun. Credit Union</u>, No. 86-4109, 1988 U.S. Dist. LEXIS 3497, at *9 (D.N.J. Apr. 6, 1988) (noting that the doctrine of equitable estoppel was designed to prevent a party's repudiation of previous conduct, if such disavowal would not be responsive to the demands of justice and good conscience).

The Court further notes that waivers of immunity have been found in situations even where no agreement exists if the international corporation "would have to subject itself to suit in order to achieve its chartered objectives." <u>Mendaro</u>, 717 F.3d at 617-20; <u>Osseiran</u>, 552 F.3d at 840; see <u>Vila</u>, 536 F.Supp.2d at 48-49; <u>Banco de Seguros del Estado v. Int'l Fin. Corp.</u>, No. 06-2427, 2007 U.S. Dist. LEXIS 69741, at *6 (S.D.N.Y. Sept. 20, 2007).